BARHAM, Justice.
 

 Jesse Grey and Johnny Grey, brothers, were charged under separate bills of information with the simple burglary of “Rev. Brown’s Store” in Lake Providence, East Carroll Parish, Louisiana, on January 16, 1969. After a joint trial both were found guilty as charged, and each was sentenced to three years in the Louisiana State Penitentiary. They have appealed, relying on seven bills of exception.
 

 Bill of Exception No. 1.
 

 Roosevelt Jones, Jr., who had previously pleaded guilty to the same burglary for which the two defendants were on trial, was called as a witness for the State-. When he testified that neither of the Grey brothers was present during the burglary, the State sought permission from the court to -impeach the witness, alleging surprise as to the testimony. The defense objected and reserved Bill of Exception No. 1 to the overruling of its objection. -The State proceeded to elicit a prior inconsistent statement from the witness.
 

 
 *1075
 
 R.S. 15 :487 provides: “No one can impeach his own witness, unless he have been taken by surprise by the testimony of such witness, or unless the witness show hostility toward him, and, even then, the impeachment must be limited to evidence of prior contradictory statements.” R.S. 15 :488 reads: “ ‘Surprise’ in the sense of the last preceding article does not arise out of the mere failure of the witness to testify as expected, but out of his testifying upon some material matter against the party introducing him and in favor of the other side.”
 

 The trial judge concluded that the testimony constituted surprise and that the witness was hostile. The evidence attached to the bill shows that in the impeachment examination the witness admitted he had previously made a contrary statement, in the presence of two law officers, to the assistant district attorney who was prosecuting the case. In the light of the witness’s earlier statement that the two Grey boys participated in the burglary with him, his testimony before the jury that they were not present clearly constituted surprise upon a material matter “against the party introducing him and in favor of the other side”. State v. Ray, 257 La. -, - So.2d -, decided Jan. 18, 1971; State v. Willis, 241 La. 796, 131 So.2d 792; State v. Smith, 193 La. 706, 192 So. 106; State v. Williams, 185 La. 849, 171 So. 52. The judge’s ruling was correct.
 

 Bill of Exception No. 2.
 

 On cross-examination the assistant district attorney asked one of the defendants whether three named witnesses who had been subpoenaed by the defense had been subpoenaed when the case had been set for trial the previous year. The defense objected, stating that it was not the duty of the accused to summons witnesses and that he could not know who had been subpoenaed. Bill of Exception No. 2 was reserved to the overruling of this objection. The witness apparently did have the requisite knowledge to answer the question, for he stated “no” categorically in response. Even if the testimony sought were inadmissible for other reasons, its admission did not constitute prejudicial error. On the basis of defendants’ objection there is no merit to this bill.
 

 Bill of Exception No. 3.
 

 Bill of Exception No. 3 was taken to the overruling of the defendants’ motion to quash the general arid petit jury venires. The motion alleges that defendants were denied the equal protection of the laws, due process, and the right to trial by an impartial jury, in violation of the Fourteenth Amendment to the United States Constitution and Article 1, Section 2, of the Louisiana Constitution. The deprivation of constitutional rights was alleged to have been accomplished by the systematic
 
 *1077
 
 exclusion of a large group of Negroes from the general and petit jury venires of East Carroll Parish, or, alternatively, by the systematic inclusion of only a token or minimal number of Negroes on these venires.
 

 Counsel for defendants has established two facts basic for the contentions raised in this bill: About 60 per cent of the population of the parish are Negroes, and of the 325 persons whose names were on the general jury venire 24 per cent were Negroes. From these facts he argues that such a disproportionate percentage of Negroes on the jury list could result only from systematic discrimination against them.
 

 Purposeful discrimination, however, may not be assumed or merely asserted; it must be proved. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In the Swain case the United States Supreme Court affirmed the conviction, by an all-white jury, of a Negro who alleged that he was denied the equal protection of the laws by discriminatory jury selection. The court said that racial discrimination resulting in exclusion from jury service of otherwise qualified groups not only violates our Constitution but is at war with our basic concepts of a democratic society and a representative government; that therefore jurymen should be selected as individuals on the basis of individual qualifications and not as members of a race. It stated: “ * * * a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. * * * Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. * * *”
 

 In an attempt to prove discrimination the defense called three witnesses: R. R. Underwood, executive director of the East Carroll Community Action Association; Cecil E. Manning, parish registrar of voters, and General Trass, a Negro member of the jury commission.
 

 Mr. Underwood’s testimony dealt with census figures and parish population, broken down into whites and Negroes. The 1960 United States census showed a population of 14,433, of which 61.2 per cent were Negroes. A parish-wide census in 1969 fixed the population at 12,497, of which 58 per cent were Negroes. The witness admitted that his testimony did not show what part of the white or non-white population of the parish met the legal requirements for jury service.
 

 The registrar of voters stated that there were 3132 whites and 410 Negroes registered to vote on the parish rolls, plus 2294 persons listed on the federal registration roll. Of the whites registered on the par
 
 *1079
 
 ish rolls 40 could not read and write, and of the 410 Negroes 34 were illiterate. Race and literacy were not required to be shown for those on the federal list, but it was estimated that approximately 2250 of these were Negroes and 45 white. If these estimates were added to the figures shown by the parish rolls, there would be 3177 whites registered to vote and 2660 Negroes. Mr. Manning stated that 1400 of the persons whose names were on the federal registration list apparently completed and signed their applications, but that the others were seemingly illiterate or at least required assistance in filling out the forms. He said he could not tell how many whites and how many Negroes were qualified for inclusion in the general jury venire.
 

 Defendants’ last witness, Jury Commissioner Trass, a Negro, principal of a school in Lake Providence, had been born and reared in East Carroll Parish and had wide acquaintance with and knowledge of its people. The jury commission worked from lists, such as the voters’ list, and from names submitted by the commissioners secured through personal knowledge or from police jury members, including the Negro police juror from Ward 7, and other persons. Names were furnished by all of the commissioners. The white commissioners supplied names of both Negroes and whites, and so did Commissioner Trass. The commissioners tried to get names of other Negroes, but those persons so secured wei;e found not to be qualified for one reason or another, generally because they could not read or write. The object of the commission was to form a general venire list which would include persons qualified under the law to serve as jurors. The witness testified: “* * * it wasn’t that we were to get a percentage of them, but we were to get the people who were available and qualified to serve on the jury, and that’s what we did. * * *
 
 We just got people
 
 * * (Emphasis supplied.) The same qualifications were used to test the eligibility of persons of both races, and nothing occurred during the work or deliberations of the commission which caused the witness to believe that race was a factor in the selections. Each of the commissioners in turn drew out a name, and all names drawn were put on the list. The list was made up indiscriminately without regard to color or race, and the witness believed that it represented a true cross-section of the qualified people of the parish. This wit-' ness doubted that even with long arid dili- ’ gent effort a list of jurors could be composed containing the same percentages of whites and Negroes as those in the population, and he doubted also that a list of even half whites and half Negroes could be made up. To the witness’s knowledge, every Louisiana law pertaining to jury selection was followed.
 

 
 *1081
 
 The State called only one witness, Mrs. Edna Bishop Brock, clerk of court and ex-officio member of the jury commission. Her testimony showed that the names of persons from all parts of the parish were brought up and considered by the commission. About 80 persons whose qualifications were not known personally to the members of the commission were summonsed and questioned, and about half of these did not qualify. To her knowledge only one white woman over the years had come forward to offer herself for jury duty, and no Negro woman had ever offered. There were three Negroes on the current grand jury, and three on the petit jury which convicted these defendants.
 
 [1]
 
 In making up the venire race was not a factor in inclusion or exclusion. Like Commissioner Trass, Mrs. Brock realized the commission’s responsibility to select impartially a cross-section of qualified persons from the parish, and she considered that this had been achieved.
 

 From the law and the evidence we conclude that the defense has failed to prove its allegations of racial discrimination in the composition of the general and petit jury venires of East Carroll Parish. On the contrary, we are impressed with the sincerity, energy, diligence, and care which, as the testimony reveals, the jury commissioners showed in their efforts to make up a proper jury list with complete impartiality and with a consideration only of the qualifications prescribed by law.
 

 The motion to quash the general and petit jury venires was properly overruled.
 

 Bill of Exception No. 4.
 

 Bill of Exception No. 4 was taken when the judge after a hearing overruled defense counsel’s motion to quash the bills of information on the grounds that the arrests of the defendants were illegal as being made without warrants and affidavits, that the accused were not booked immediately and taken before a committing magistrate, that they were not advised of their right to a preliminary examination, that no preliminary examination was held, and that they were not effectively advised of their right to remain silent and their right to counsel.
 

 The matters raised by this bill of exception are not proper grounds for a motion to quash an indictment or information. See C.Cr.P. Arts. 531-534. It is a well established rule of law that an illegal arrest is no bar to a prosecution on a subsequent indictment or information by which the court acquires jurisdiction over the person of the defendant. State v. Green, 244 La. 80, 150 So.2d 571; State v. Simpson, 247 La. 883, 175 So.2d 255; see State v. Jones, 250 La. 1007, 201 So.2d 105. Moreover,
 
 *1083
 
 the fact that the accused were not taken before a committing magistrate affords no legal ground under the law of this state for the quashing of a subsequent indictment or information. State v. Simpson, supra. In any event, this bill is without merit since the evidence attached does not support the allegations. On the contrary, the evidence sustains the contentions of the State that affidavits were filed, that the arrests were with warrants, that the defendants were properly booked, and that they were advised of their rights, including their right to a preliminary examination.
 
 [2]
 

 Bill of Exception No. 5.
 

 This bill, taken to the overruling of a motion to suppress, has been abandoned. Indeed, the motion was without basis since no physical evidence was offered on the trial and no statements of the defendants were introduced.
 

 Bill of Exception No. 6.
 

 Bill of Exception No. 6 was reserved to the overruling of a motion in arrest of judgment. The motion alleges that although the defendants were charged by separate bills of information, they were tried jointly, in contravention of Code of Criminal Procedure Article 706, which provides : “Upon motion of a defendant, or of all defendants if there are more than one, the court may order two or more indictments consolidated for trial if the offenses and the defendants, if there are more than one, could have been joined in a single indictment. The procedure thereafter shall be the same as if the prosecution were under a single indictment.”
 
 [3]
 

 In the circumstances of this particular case, we need not pass upon whether the joint trial of the separately charged defendants would constitute reversible error. The judge’s ruling attached to the bill tells
 
 *1085
 
 us that at the commencement of this trial, in open court he directly called to the attention of defense counsel that the cases had been consolidated, and counsel stated that he had no objection to this. Counsel does ' not dispute this statement of the court. The defendants could waive, and we hold that they did waive, their right to be tried separately when charged under separate bills of information.
 

 Bill of Exception No. 7.
 

 This bill was taken to the overruling of defendants’ motion for a new trial. The motion in the main reiterates the objections presented by the other bills which we have already discussed. The allegation that the verdict is contrary to the law and the evidence and the attack upon the credibility of the witnesses and their evidence present no question of law for our review. The contention that one of the defendants was prejudiced before the jury because of his “bushey headed appearance” is without substance. There is no allegation that this condition was attributable to the State. The allegation of prejudice because of the assistant district attorney’s reference in his closing argument to the necessity of maintaining law and order cannot be considered since no objection to this remark was timely made. Moreover, the remark taken in the context of the argument, the relevant portion of which is attached to the bill of exception, is not prejudicial. Bill No. 7 is without merit.
 

 The convictions and sentences are affirmed.
 

 [1]
 

 . The motion to quash the venires was filed before trial but by agreement was taken up after-wards.
 

 [2]
 

 . According to the redactors’ introductory statement to Title VII of the Code of Criminal Procedure, “Preliminary Examination”, a defendant’s right to a preliminary examination, though seldom asserted, is an important protection against highhanded police procedures and third-degree methods, and provides an opportunity to bring defense counsel into the picture, thus implementing the constitutional privilege against self-incrimination and the right to bail. The evidence attached to this bill shows no “high-handed police procedures” or “third degree methods”. There is ño indication that either defendant made an incriminating statement, and both were admitted to bail. Therefore, prejudice could not result from the lack of such a hearing. Moreover, they did not request a preliminary examination after being informed of their right to make such a request.
 

 [3]
 

 . The redactors’ comment under this article states that although the federal rule allows consolidation by the court on its own motion or even on the motion of the state and over the objection of a defendant, this article does not. The comment further says: “ * * * however, the state can accomplish the same result by dismissing all charges and recharging in a consolidated form.”