253 So.2d 370

STATE of Louisiana

v.

Sebeal RABY.

No. 51055.

Oct. 8, 1971.

Rehearing Denied Oct. 28, 1971.

Philip K. Jones, Edwin R. Woodman, Jr., Baton Rouge, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., Harry H. Howard, Asst. Atty. Gen., Sargent

Pitcher, Jr., Dist. Atty., Ralph L. Roy, Asst. Dist. Atty., for plaintiff-appellee.

McCALEB, Chief Justice.

 Appellant, Sebeal Raby, was charged in a bill of information with aggravated arson. Following his plea of not guilty the case was consolidated for trial with another criminal charge then pending against appellant for conspiracy to commit armed robbery. On the trial of these consolidated cases before a jury of twelve, a verdict of guilty in each case was returned on September 24, 1969. Thereafter, on October 28, 1969, on a hearing of appellant's motions in each case for a new trial and in arrest of judgment, the judge granted the motion for new trial in the criminal conspiracy to commit armed robbery case but denied the motions in the aggravated arson case, and appellant was sentenced to serve twelve years in the Louisiana State Penitentiary.[1] Appellant has prosecuted this appeal from his conviction and sentence in that case, relying on fifteen bills of exceptions for a reversal.

In our examination of the pleadings and proceedings below, following the submission of the case to us for decision, we have found that the bill of information charging aggravated arson is couched in the same language and contains substantially the same allegations as the bill of information which was held to be fatally defective in State v. Leon Harold Butler, No. 51,026 of our Docket, decided by this Court on June 28, 1971, in which a rehearing was refused on August 12, 1971. See 259 La. 560, 250 So.2d 740.

 The bill of information in the instant proceeding recites that Lloyd Jones, Sebeal Raby and James Thomas feloniously did violate R.S. 14:51 " * * * in that they intentionally damaged a dwelling located at 167 South 15th Street, Baton Rouge, Louisiana, by setting fire to said dwelling, whereby human life was endangered * * *." This charge, in which the prosecutor elected not to use the short form, is identical with the bill of information in the Butler case except for the state-

---

1. In view of the fact that the jury verdict in the conspiracy to commit armed robbery prosecution was set aside by the granting of a new trial, that matter is not before us for review. However, we observe that the joinder for trial of separate and distinct crimes in one proceeding is highly irregular and unauthorized by the law of this State, save under special conditions or circumstances. Article 706 of the Code of Criminal Procedure, while permitting consolidation for trial of separate offenses, provides that consolidation may only be ordered "Upon motion of a defendant, or of all defendants if there are more than one * * * if the offenses and the defendants, if there are more than one, could have been joined in a single indictment." Cf. Fed.Rule 13. It would not have been permissible to charge the different offenses here consolidated in one indictment or information (see Article 493 of the Code of Criminal Procedure) and, hence, consolidation was improper under Article 706 C.Cr.P.

ment that the building set fire in this matter is alleged to be a dwelling, whereas it was alleged that it was a structure which was burned in the Butler case. In holding that the bill of information in the Butler case did not adequately charge the offense denounced by R.S. 14:51, we based our conclusion upon the failure of the prosecutor to allege that the offender intentionally set fire to the building or structure when it was foreseeable that human life might be endangered. Absent such a recital, when the short form is not used, renders the information violative of the accused's fundamental right to be " * * * informed of the nature and cause of the accusation against him * * * " as specified by Section 10 of Article I of the Louisiana Constitution. Since foreseeability (or anticipation, see R.S. 14:2) that human life might be endangered is the gravamen of aggravated arson, it must be alleged in order to state the offense—for, although an indictment need not be phrased in the language of the statute, it must state *every essential fact* constituting the crime. Article 464 C.Cr.P.; State v. Bonfanti, 254 La. 877, 227 So.2d 916 (1969); and State v. Butler, supra.

In a supplemental brief filed in compliance with a request by this Court, the District Attorney concedes that the Butler case is indistinguishable but takes the position that that authority should be overruled. This we will not do. Albeit decided by a closely divided vote, the Butler case was fully reconsidered on the State's application for a rehearing, and the original opinion was sustained by the majority.

Additionally, the prosecutor contends that this Court is without right to nullify the defective bill of information because the bill has never been assailed by defense counsel; that it is not a matter within the scope of our appellate review as defined by Article 920 C.Cr.P. and that, in any case, appellant may, if the judgment is affirmed, pursue the post-conviction remedy of habeas corpus under Article 362(9) C.Cr.P.

There is no merit in these contentions. Article 920(2) of the Code of Criminal Procedure specifically recognizes the right of appellate review of any error " * * * that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." It has long been our procedural law, statutory (R.S. 15:503, 15:558 and 15:560) and jurisprudential, that this Court may notice, on appeal, ex proprio motu, errors patent on the face of the record, such as fatally defective pleadings, even though no objection thereto has been raised below or by assignment of error here. See Article 920(2) C. Cr.P., Official Revision Comment (a).

For the reasons assigned the conviction and sentence are reversed and appellant is ordered discharged.

BARHAM, Justice (dissenting).

For the same reasons assigned in my dissent in State v. Butler, 259 La. 560, 250 So.2d 740, I dissent from the court's quashing the bill of information in the instant case and discharging this defendant. I am of the opinion, however, that the trial court committed error in the present case which requires us to reverse and remand.

The defendant Sebeal Raby was jointly charged with Lloyd Jones and James Thomas, but the district attorney elected to sever the information against Raby and try him separately. It was the State's attempt to use Lloyd Jones as a witness which led to reservation of several bills of exception. These bills raise the important legal issue of whether the State could read in the presence of the jury and offer in evidence a prior statement by the State's own witness, Jones, for the purpose of impeaching his testimony on the ground that he was hostile and his testimony on a material matter was against the State and a surprise.

The early rule in Louisiana following the common law was that the party calling a witness vouched for his credibility and could not impeach his testimony or attack his credibility. State v. Vickers, 47 La. Ann. 1574, 18 So. 639; State v. Robinson, 52 La.Ann. 616, 27 So. 124; State v. Gallo, 115 La. 746, 39 So. 1001. Gradually our courts began to recognize the jurisprudential trend throughout the country that there were exceptions to the hard and fast rule that the credibility of one's own witness could never be attacked. State v. Stephens, 116 La. 36, 40 So. 523; State v. Fletcher, 127 La 602, 53 So. 877; State v. Walters, 145 La. 209, 82 So. 197; State v. Bodoin, 153 La. 641, 96 So. 501; State v. Corneille, 153 La. 929, 96 So. 813; State v. Glauson, 165 La. 270, 115 So. 484; State v. Ashworth, 167 La. 1085, 120 So. 865. These cases were decided before our 1928 Code of Criminal Procedure, and while recognizing the right of impeachment, they held, in general, that the prerequisites necessary to impeachment of one's own witness had not been established by the State —that is, the witness's hostility, the State's surprise, and testimony contradictory to an earlier statement on a material matter. Two cases, though recognizing the error, applied the harmless error rule. One case allowed the use of a prior statement to refresh the witness's memory rather than for impeachment or as an attack upon credibility.

The first case citing and relying on our Code of Criminal Procedure of 1928 was State v. Nash, 169 La. 947, 126 So. 434.[1]

---

1. For cases thereafter dealing with this problem, see State v. Soileau, 171 La. 801, 132 So. 351; State v. Avery, 176 La. 264, 145 So. 535; State v. Williams, 185 La. 849, 171 So. 52; State v. Cooley, 185 La. 1032, 171 So. 435; State v.

Articles 487, 488, and 493 of the Code of 1928 were carried forward into our present Revised Statutes, Title 15, with the same numbers and in the same language. The pertinent sections of Title 15 read:

"§ 487. Impeachment of own witness

"No one can impeach his own witness, unless he have been taken by surprise by the testimony of such witness, or unless the witness show hostility toward him, and, even then, the *impeachment must be limited to evidence of prior contradictory statements.*"

"§ 488. Meaning of surprise

"'Surprise' in the sense of the last preceding article does not arise out of the mere failure of the witness to testify as expected, but out of his *testifying upon some material matter against the party introducing him* and *in favor of the other side.*"

"§ 493. Foundation for proof of contradictory statement

"Whenever the credibility of a witness is to be impeached by proof of any statement made by him *contradictory* to his testimony, he must first be asked *whether he has made such statement* and his *attention must be called to the time, place and cir-*cumstances, and to the person to whom *the alleged statement was made,* in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible." (Emphasis here and elsewhere has been supplied.)

These statutes, which recognize the exception to the strict rule of never permitting a party to impeach his own witness, are a codification of our jurisprudence and of the common law. As first adopted, they were in accord with the majority rule then existing, and the principles which they embody are still the prevailing and orthodox rule. In summary, the rule which we follow and which is followed in the great majority of jurisdictions is: A witness who is hostile and surprises the party calling him by testifying adversely on a material matter may be impeached by a prior contradictory statement; the contradictory statement, however, can be used only to impeach the witness, has no testimonial value for the jury in its consideration of guilt or innocence of the accused, and the jury must be so instructed. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489;[2] Annotation, 133 ALR 1454 and Sup-

Smith, 193 La. 706, 192 So. 106; State v. Johnson, 220 La. 1075, 58 So.2d 389; State v. McMullan, 223 La. 629, 66 So. 2d 574; State v. Knox, 236 La. 461, 107 So.2d 719; State v. Willis, 241 La. 796,

131 So.2d 792; State v. Tytus, 256 La. 962, 240 So.2d 723.

2. California v. Green held constitutional a section of the California evidence code which permitted a prior statement to be

plements; McCormick on evidence HB §§ 38, 39 (1954); 1 Underhill's Criminal Evidence § 232 (5th ed. 1956) and Supplement; 3 Wigmore on Evidence § 1018 fns. 2 and 3 (3rd ed. 1940) and Supplement.

On direct examination by the State, the witness Jones, after admitting that he knew the defendant Raby and also James Thomas, was asked whether he knew them on March 26 of last year, 1968. The examination then proceeded as follows:

"A I mean, I can't definitely say March or when it was, you understand, but I knowed them last year.

"Q All right. Do you know in March of last year what Sebeal Raby—where he was working or what he was doing, do you know?

"A It's like I tell you, like this here. Sometimes a man come and go and sometimes I think about things, sometimes I don't. Just like what hap-

pened last year I'm not sure of it myself. I been to the hospital about four times and I say things, some times I say things for spite and some times I say it and means it and some times—

"THE REPORTER: Some times you what?

"A I say some times in spite or when I have animosity against somebody or either some time I might even think about things, just like a dream, it happens and it don't happen.

"Q Well, let me ask you this, did you have occasion last year to be in an automobile being driven by Sebeal Raby in the company of James Thomas and Booster Clark?

"A I don't know. It could have been last year. It could have been five years ago—I don't know. I knowed a lot of people last year.

used not only to impeach the credibility of the witness but also as substantive evidence of what was contained in the statement. The court there said that the California rule " * * * represents a considered choice by the California Legislature between two opposing positions concerning the extent to which a witness' prior statement may be introduced at trial without violating hearsay rules of evidence. The orthodox view, adopted in most jurisdictions, has been that the out-of-court statements are inadmissible for the usual reasons that have led to the exclusion of hearsay statements: The statement may not have been made under oath; the declarant may not have been subjected to cross-examination

when he made the statement; and the jury cannot observe the declarant's demeanor at the time he made the statement. Accordingly, under this view, the statement may not be offered to show the truth of the matters asserted therein, but can be introduced under appropriate limiting instructions to impeach the credibility of the witness who has changed his story at trial." The court then stated: "Our task in this case is not to decide which of these positions, purely as a matter of the law of evidence, is the sounder." The court found that such a state rule was not violative of the Confrontation Clause of the United States Constitution.

"Q Well, let's say at any time, do you have a recollection of being with all those people, regardless of the time?

"A Yeah, I remember being with them.

"Q All right. Did you all do anything unusual—was that in the day time or at night?

"A Well, I'm going to put it like this here. If it was unusual, didn't seem like it to me, understand, I mean just like I say, I could have thought it happened that way or I could have dreamed it happened that way, which for myself I don't know whether it happened or not. That's one thing I ain't sure of, nothing.

"Q I want to show you an instrument dated March 28, 1968, which purports to bear your signature, is this your signature.

"A Yeah, that's my signature.

"Q Can you read?

"A I can read.

"Q Would you just read this thing to yourself?

"A I have read it already once this morning."

There followed a colloquy before the jury between the defendant's counsel, the district attorney, and the court. The district attorney pleaded surprise and hostility and asked the court to permit him to im-

peach his witness, and counsel for defendant objected that there had been no prior inconsistent statement shown. The jury was retired, and further discussion was had between counsel and the court. After the jury was returned and when the witness was recalled, the district attorney continued:

"Q Now, Lloyd, before we took this little recess when you were on the stand before, in view of the situation I pleaded surprise and I informed the Court that I intended to lay a foundation in order to impeach you by trying to show that you made a statement before today concerning this thing which is inconsistent with your present testimony. At this time I want to read the statement to you and I want to ask you—when I get through I'll ask you one question. Now, will you listen? I know you said you read it but I want to read it to you and I want you to listen, will you do that?

"A I'll listen."

Following further objection and colloquy between counsel and the court, the judge ruled in favor of the State, and the district attorney read a statement which incriminated the defendant Sebeal Raby and others in the crime charged. Objections were made and bills of exception reserved several times, including an objection and reser-

vation of a bill to a later offering of the written statement in evidence for the purpose of impeachment.

A review of the questioning of the witness by the district attorney which led to the reading of the prior statement to the jury forces the following conclusions: (1) The colloquy between the district attorney and the witness does not establish that which constitutes legal surprise and hostility of the witness. (2) The witness answered the questions directed to him or stated that he could not remember or did not know. (3) The witness Jones never testified upon any material matter "against" the State or "in favor of" the defendant. (4) The witness admitted that the signature on a document presented to him was his signature. He was never asked whether he had made the statement or whether it was contrary to what he was saying upon the trial of the case. (5) The witness's attention was not called to the time, place, and circumstances of the alleged statement or to the person to whom it was made. (6) The witness's answers ("I don't know", "* * * didn't seem like it to me * * *", "* * * I don't know whether it happened or not", "That's one thing I ain't sure of, nothing") are in no way contradicted by a statement allegedly given by him relating facts and circumstances as he recalled them more than a year and a half before the trial.

State v. Walters, 145 La. 209, 82 So. 197, is a Louisiana case directly in point. The witness in that case testified that he did not remember any of the circumstances and that he could not remember whether he had previously testified, but that he could identify his signature on a written statement. The court said: "* * * The witness did not give any evidence whatever on the trial of the cause. He simply answered that he knew nothing at all of the facts of the case. Under such circumstances he should have been told to stand aside. He had given no evidence to be impeached by the district attorney. * * *" The court then quoted from Underhill's Criminal Evidence language similar to that which is contained in our R.S. 15:487 and 488.

In State v. Soileau, 171 La. 801, 132 So. 351, the court stated: "* * * Article 487 of the Code of Criminal Procedure provides that one may impeach the testimony of his own witness when he is taken by surprise by the testimony of the witness, provided the impeachment be limited to evidence of previous contradictory statements; and article 488 defines the word 'surprise' as meaning, not such a surprise as might come merely from a failure of the witness to testify as expected, but a surprise resulting from his testifying on some material matter against the interest of the party introducing him and in favor of the other side. That is how the witness testified in this case, when he testified, substantially, that Chester Soileau struck Otis Soileau in the face and threw him

down before Otis Soileau used his knife." In State v. Avery, 176 La. 264, 145 So. 535, the court, citing State v. Soileau, supra, then determined what was a material matter against the interest of the party introducing the witness. In State v. Grey, 257 La. 1070, 245 So.2d 178, we said: " * * * In the light of the witness's earlier statement that the two Grey boys participated in the burglary with him, his testimony before the jury that they were not present clearly constituted surprise upon a material matter 'against the party introducing him and in favor of the other side'. * * * " See 62 Yale Law Journal 650 for a discussion of "traditional damage".

" * * * In order that one's own witness may be contradicted, mere silence or ignorance on his part is not enough. The witness must testify expressly, and in terms to facts which are in direct contradiction to his prior extrajudicial statements." Underhill, supra, § 232; see fn. 69, citing the Louisiana case of State v. Avery, supra. Underhill goes on: "The rule by which one's own witness, who unexpectedly proves hostile, may be impeached by proving contradictory statements made out of court has been confirmed by statute in some states. The rule applies to criminal as well as to civil cases. But such statutes, being in derogation of common-law principles, usually receive a strict construction. All the circumstances of time, place and person are to be detailed to the witness. It is not enough merely to ask him if he made contradictory statements to a particular person, without stating where and when they were made. The extent to which the impeachment of one's own witness may be carried is largely a matter of judicial discretion. It must appear that the witness is hostile and not merely reluctant to testify. Unless the testimony is actually prejudicial to the party calling the witness, he cannot be impeached." Underhill, supra, § 232.

While McCormick advocates what he admits is the unorthodox rule (that previous contradictory statements may be used upon the question of guilt or innocence), he states the orthodox rule, which is basically our R.S. 15:487 and 488, and gives the conditions which are imposed by that rule before one may impeach his own witness. " * * * The first is that the party seeking to impeach must show that he is surprised at the testimony of the witness. *The second is that he cannot impeach unless the witness' testimony is positively harmful to his cause, reaching further than a mere failure ('I do not remember,' 'I do not know') to give expected favorable testimony.* These limitations are explainable only as attempts to safeguard the hearsay policy by preventing the party fron proving the witness' prior statements in situations where it appears that its only value to the proponent will be as substantive evidence of the facts asserted. * * * " McCormick, supra, § 38.

There is some jurisprudence in Louisiana which lends support to the contrary and minority view. Insofar as there is any jurisprudence contrary to the views here expressed, I believe it the obligation of this court to overrule it under the express statutory requirements and the other supportive jurisprudence.

It is the obligation of the party who wishes to impeach to supply the foundation which permits the introduction of a prior inconsistent statement as an exception to the hearsay rule. The State has failed to establish its right to impeach the witness Lloyd Jones in the particulars previously noted. I would therefore reverse and remand. I must respectfully dissent, however, from the quashing of the information.

SANDERS, Justice (dissenting).

Having dissented in State v. Butler, 259 La. 560, 250 So.2d 740 (1971), I also dissent in the present case.

The bill of information here charges that Sebeal Raby and his co-defendants "did violate R.S. 14:51 in that they intentionally damaged a dwelling located at 167 South 15th Street, Baton Rouge, Louisiana, by setting fire to said dwelling, whereby human life was endangered. * * *"

LSA–R.S. 14:51 defines aggravated arson as the "intentional * * * setting fire to any structure, watercraft, or mova-

ble wherein it is foreseeable that human life might be endangered."

Article 465 of the Louisiana Code of Criminal Procedure provides that the crime made be charged by merely alleging in a short form, "A. B. committed aggravated arson of a dwelling." It is apparent, therefore, that the present charge contains all the information set forth in the short form, plus other information concerning the offense. Article 465 contains no requirement that the pleading track the language of the form word-by-word. It is sufficient, I think, that the charge be couched in equivalent terms. Hence, the charge should be upheld under Article 465, C.Cr.P.

If, however, the charge is treated as a long form, then it is also sufficient to satisfy the requirements of law.

When it alleges that the defendant "intentionally" set fire to a "[dwelling] whereby human life was endangered," it means that the defendant intended to endanger human life. As noted by Mr. Justice Hamlin, dissenting in State v. Butler, supra, the intent encompasses foreseeability.

I regret that the Court has pressed technicalities too far. I believe that the law would be better served by applying a validating construction to the words used. In my opinion, the charge is adequate.

For the reasons assigned, I respectfully dissent.