559 So.2d 1310 (1990)
STATE of Louisiana
v.
Tracy LEE.
No. 89-KA-0843.
Supreme Court of Louisiana.
March 12, 1990.
Rehearing Denied April 5, 1990.
*1311 C.R. Whitehead, Jr., Robert L. Salim, Kelly & Salim, Richard Guerriero, Faria & Guerriero, Dennis Shlenker, Feit & Shlenker, for appellant.
William J. Guste, Jr., Atty. Gen., Stephen Mike Henry, Dist. Atty., for respondent.
CALOGERO, Justice.
Upon defendant Tracy Lee's first appeal of a first degree murder conviction and sentence to death, we affirmed the conviction but on rehearing upset the death penalty and remanded for a new trial of the sentencing hearing. State v. Lee, 524 So.2d 1176 (La.1988). We held then that the use of the defendant's illegally obtained confession was not harmless inasmuch as its impact on the sentencing phase of the trial may have contributed to the jury's imposition of the death sentence.
A second sentencing hearing was held on September 22 and 23, 1988. A newly impaneled jury again recommended the death penalty and defendant has appealed to this Court once more.
On the night of June 15, 1985, the defendant entered the home of Mrs. Marjorie Blackston in Natchitoches, Louisiana through an unlocked back door. He wore a mask over his face and was armed with a pistol. He first encountered Mrs. Blackston's daughter, Chandra, 18 years old, in the living room, pointed a gun to her face, and pulled her into the kitchen. Rohn Blackston, Mrs. Blackston's 15-year old son, then entered the kitchen and discovered defendant and his sister, Chandra. Believing that the incident was a joke, he tried to guess the identity of the defendant. Lee responded by shooting Rohn in the face. Startled by the noise, Mrs. Blackston came into the room and, upon discovering what had happened, tried to run through the house to escape. Lee ran after her with Chandra and forced them both into a back bedroom. Following Mrs. Blackston's plea to attend to her son, defendant went back into the kitchen where Rohn was lying on the floor and shot him again in the *1312 back of the head, this time killing him. Lee returned to the women in the bedroom, where he raped them both. Lee then went through the house removing his fingerprints, then back into the bedroom, raped the two women again and forced Chandra to perform oral sex upon him. He then stole $45 from Chandra and wiped the house down again for fingerprints. When they concluded that the defendant had left the house, Marjorie and Chandra escaped through the bedroom window and called the police and an ambulance from a neighbor's house. Lee was arrested the following morning as he attempted to leave Fort Polk where he was stationed as a United States Army enlisted man. The defendant and all of the three victims were black.
The defendant raises ten assignments of error stemming from the resentencing hearing. Five of the ten assignments (Numbers 1, 2, 3, 5 and 6) are treated in the body of this opinion. Five others (Numbers 4, 7, 8, 9 and 10) are resolved by clearly applicable law, and are thus included in an unpublished appendix, which is attached to this opinion and is part of the official record.
Assignment of Error No. 1
For his first assignment of error, defendant complains of the trial judge's refusal to grant a change of venue. He claims that because of extensive press coverage in such a small community, as well as talk among the parish residents concerning the crime, he was unable to get a fair trial in Natchitoches, Louisiana. The defense introduced testimony by Hartwell M. Doty, accepted by the trial judge as an expert in public opinion polling, to prove the widespread knowledge throughout the community and the prejudice towards Tracy Lee stemming from the murder and rapes.
Of the 200 registered voters[1] interviewed by Doty, 65% recognized the name of the defendant. 75% of those called were aware of the facts of this case. The respondents stated that their predominate sources of information concerning this crime were the newspaper (50%) and word of mouth (30%). Furthermore, of those aware of the crime, 40% favored the death penalty for Tracy Lee. The defense argues that the extent of the knowledge and the fact that many respondents had already made up their minds, necessitated moving the trial to another parish.
The defense also places much emphasis on the fact that this crime was so well remembered three years after it happened because it was one of the most notorious offenses that had occurred in this parish. That factor contributed to the prejudice against Lee, according to the defense. It is also alleged that this case generated more than usual sympathy towards the murder victim, Rohn Blackston, because it was reported in a few newspaper articles that he had recovered from a brain tumor. In addition, the defense contends that this Court's session in Natchitoches, Louisiana on April 11, 1988, just five months before the resentencing hearing, generated additional publicity.[2]
The trial judge is given broad discretion in ruling on a motion for change of venue. Nevertheless, this Court is required to conduct an independent review of the facts to ensure that the trial was conducted fairly and in a nonprejudicial environment. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); State v. David, 425 So.2d 1241 (La.1983); State v. Goodson, 412 So.2d 1077 (La.1982). A defendant is constitutionally entitled to a fair trial free from prejudice and undue influence. La. Const. Art. I, § 16; La.C.Cr.P. art. 622. A fair trial does not mean, however, that the jury must be totally ignorant of the case. The defendant must show *1313 more than that the public had knowledge of the facts, but rather must prove that there exists a prejudice in the collective minds of the community that would make a fair trial impossible. State v. Comeaux, 514 So.2d 84 (La.1987); State v. Brown, 496 So.2d 261 (La.1986).
Defense counsel introduced 48 newspaper articles at the venue hearing in an effort to show the widespread publicity that this crime generated. While media coverage may have been extensive, a review of the articles reveal that the coverage consisted primarily of factual accounts of the events and that none were of an inflammatory nature. Furthermore, the bulk of the articles (39 of the 48) appeared in 1985, either immediately following the crime or during the original trial; only 3 in 1986; 1 in 1987; and 5 in 1988. Media publicity will not require a change of venue unless the "`trial atmosphere' has been `utterly corrupted by press coverage.'" State v. Clark, 442 So.2d 1129 (La.1983); State v. Morris, 429 So.2d 111 (La.1983). That has not been the case here.
In determining whether a change of venue is warranted, it is helpful, in part, to review the responses of the prospective jurors on voir dire. Here, the comments made by the prospective jurors do not reflect prejudice towards this defendant. While many were aware of the crime, most knew only vague facts, mainly that a murder and rapes had occurred. In fact, 32% of those questioned knew nothing of the crime at all. Furthermore, it must be remembered that this resentencing hearing occurred 3 years after the murder. Knowledge of detailed facts surely had faded by that time, as the responses on voir dire indicated. Nor did the remarks by prospective jurors reflect that they were predisposed to a certain result; rather, by and large, they stated that their minds were not made up, and they would wait to hear all of the evidence before making a decision. Those jurors who had extensive knowledge of the facts and had already made a decision were excused for cause.
Most importantly, both the D.A. and defense counsel told the jurors of the facts of the case during voir dire, including that the defendant had already been found guilty. It is of significance that this trial involved only the penalty phase, and not a determination of Lee's guilt or innocence. Therefore, prior knowledge of basic facts was not nearly as significant as it might be where both guilt and penalty are to be tried before the same jury.
The trial judge did not abuse his discretion in denying the motion for a change of venue.
Assignment of Error No. 2
The second asserted error concerns the denial of the defendant's motion to quash the jury venire. Defendant alleges that the jury venire did not represent a fair cross-section of the community and that the black race was substantially underrepresented; that the jury venire was not obtained by an impartial selection process; that the jury venire process systematically excluded members of the black race; and that the process used to obtain the general venire was abused or subject to abuse based on the fact that members of the black race were "grossly" underrepresented.
A general jury venire "shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race." La.C.Cr.P. art. 419(A). The defendant bears the burden of proving the grounds for setting aside the venire. State v. Liner, 397 So.2d 506 (La. 1981); State v. Manning, 380 So.2d 54 (La.1980). That burden of proof requires that the defendant show more than the underrepresentation of blacks on the petit jury venire in order to prove a systematic exclusion of blacks. Manning, supra; State v. Anderson, 315 So.2d 266 (La.1975). The law requires that there must not be a systematic exclusion of blacks in the source *1314 or sources from which jury venires are chosen. However, that does not mean that a defendant is entitled to a petit jury which reflects the population of the community in every respect. "Defendants are not entitled to a jury of any particular composition." Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); State v. George, 371 So.2d 762 (La.1979). In fact, a jury comprising a complete representation of the various groups within the community would be virtually impossible to seat. State v. Cage, 337 So.2d 1123 (La. 1976).
As part of their evidence to prove that blacks were unconstitutionally excluded, the defense called Mr. Irby Knotts, Clerk of Court of Natchitoches Parish, to explain the jury venire selection process. Knotts stated that names were chosen from the list of registered voters in Natchitoches Parish.[3]
Knotts' secretary, one Evelyn Moses, a black employee, made a random selection of names from 4 distinct stacks, one for each of the 4 wards (1, 2, 3 and 4) comprising Natchitoches Parish. These 4 stacks contained the names of all registered voters in the parish. Knotts testified that there were 19,923 registered voters in Natchitoches parish at the time this venire was drawn. Of these, 55.22% resided in Ward 1; 17.61% resided in Ward 2; 13.67% resided in Ward 3; and 13.50% resided in Ward 4. Because Ward 1 contained a much larger share of the population than the other 3 wards, Moses was generally instructed to pull a larger number from the stack of Ward 1 voters. She was never told to pull a particular number or percentage from any of the stacks, however. Questionnaires were then sent to those individuals randomly selected by Ms. Moses from the respective stacks.
Ms. Moses sent questionnaires to 312 selected voters in Ward 1, and 216 questionnaires in each of Wards 2, 3 and 4. Of the 312 questionnaires mailed in Ward 1, 203 responded. Of the 216 mailed in Ward 2, 171 responded. Of the 216 mailed in Ward 3, 182 responded. Of the 216 mailed in Ward 4, 170 responded. When the questionnaires were answered and returned by the voter, those names were placed in a box. All told 726 responses were received. These 726 were added to the 158 names from a prior pool, and all were put in the box.[4]
Pursuant to orders of the district court dated June 13, 1988 and June 29, 1988 regarding selection of jury venires, two members of the jury commission pulled 350 names from the box. From these 350 names, 125 were randomly drawn for the general venire for Division A, to begin in September 1988; and 85 names were randomly selected for Division B, to begin in October 1988. Tracy Lee was tried in Division A.
Of the 125 names drawn for Division A, only 2 were from Ward 1, a ward comprising 55% of the registered voters of Natchitoches Parish.[5] Of the 85 names drawn for Division B, 48 were residents of Ward 1. This unusual disparity between the chosen jury venires for the Division A and Division B panels, prompts defense counsel to contend that there must somehow have existed a systematic exclusion of blacks or some kind of selectivity in choosing the venire for Division A.
55% of the population of Natchitoches Parish resided in Ward 1 wherein there *1315 were 11,001 registered voters. Of these, 4,262, or 38%, were black. The percentage of blacks living in the remaining wards (2, 3 and 4) was not grossly dissimilar. Ward 2 was 29% black; Ward 3 was 21% black; and Ward 4 was 36% black. Overall, Wards 2, 3 and 4 were 28% black.
While it does appear strange that only 2 of the 125 selected for Division A were from the ward containing 55% of the population (Ward 1), and that with respect to Division B, 48 of the 85 chosen names were from that same Ward (Ward 1), the defendant did not present any evidence that this was the consequence of discriminatory selection nor that the process resulted in a systematic exclusion of blacks.
The only suspect area in the selection process which appears in the record was the discretion practiced by the black secretary when she decided to send questionnaires to 312 randomly selected voters of Ward 1 and 216 randomly selected voters each from Wards 2, 3, and 4. While 55% of the voters resided in Ward 1, the 312 represented only 32.5% of the questionnaires sent. That would skew the result to disfavor Ward 1 residents in the final selection. Yet the favored wards (2, 3 and 4) (45% of the population), regarding the percentage of black voters, were not significantly different from Ward 1 (Wards 2, 3 and 4 were 28% black, and Ward 1 was 38% black).
Had Ms. Moses or anyone else wanted to exclude blacks from the venire there would not have been much profit in selecting some voters from Wards 2, 3 and 4, which are overall 28% black, in place of some voters from Ward 1, wherein the blacks comprised 38%.
Even though Ward 1 registered voters were underrepresented in the jury venire, (2 of 125) it does not follow that blacks were grossly underrepresented in the 350 names from which the venire was selected, nor in the venire itself. (The record identifies the race of only the 69 voters (of 125) who were called for examination. 13% of these were black.)
Furthermore, a disproportionate number of blacks on the general venire standing alone, does not indicate that a systematic exclusion of blacks has taken place. In State v. Grey, 257 La. 1070, 245 So.2d 178 (La.1971), only 24% blacks were represented on the jury venire whereas the parish population consisted of 60% blacks. This Court upheld the venire there, finding that the disparity alone was insufficient to prove discrimination. A general venire was set aside in State v. Jacko, 444 So.2d 1185 (La.1984) where the black population consisted of 21% black and only 5.33% of the venire was black. In that case, however, the selection process was shown to be faulty. One employee decided which names to include in the jury pool "from the way the person talk[ed]" when they registered to vote. In this case, no such discretionary selection process was shown. Two of the four jury commissioners pulled the names randomly from the venire box. These slips of names in no way indicated the race of the prospective juror. The disparity in numbers alone is not sufficient to set aside the general venire.
Defense counsel also argues that the jury pool was tainted because of the failure by the jury commission to remove the 158 names drawn for the previous venire in contravention of the jury commission's order to destroy all old names. However, Knotts testified that those names were selected in the same manner as the new venire. Furthermore, the removal of the old names is not constitutionally nor statutorily required. See La.C.Cr.P. art. 408. There is no evidence of discrimination in the selection process, thus the motion to quash the jury venire was properly denied.
Assignment of Error No. 3
Defendant's third assignment of error raises the alleged failure of the trial judge to allow defense counsel to conduct full voir dire examination of prospective jurors and alleges that the trial judge improperly denied several challenges for cause.
We will first address the allegation that the defense was prevented from fully questioning *1316 prospective jurors on voir dire. A criminal defendant is constitutionally entitled to conduct a full and complete examination of prospective jurors on voir dire. La. Const. art. I, § 17; La.C.Cr.P. art. 786. This right provides the defendant the opportunity to excuse jurors for cause, La.C. Cr.P. art. 797, and also gives the defendant the opportunity to intelligently exercise peremptory challenges. La.C.Cr.P. art. 799; State v. Duplessis, 457 So.2d 604 (La. 1984). Defense counsel should be given "wide latitude" during voir dire, within reasonable limits, to explore the attitudes and experiences of the prospective jurors. State v. Jackson, 450 So.2d 621 (La.1984); State v. Robinson, 404 So.2d 907 (La.1981); State v. Clark, 325 So.2d 802 (La.1976). At the same time, however, the trial judge is given much discretion to limit voir dire as long as the defendant is not deprived of a reasonable opportunity to intelligently exercise his challenges. Duplessis, supra.
Defendant contends that the trial judge improperly limited defense counsel's questions concerning a defendant's choosing not to testify. During the examination of the second prospective juror, defense counsel sought to elicit the juror's views on this subject by suggesting reasons, in general, why a defendant may not testify. The trial judge, upon the D.A.'s objection, instructed counsel, outside the presence of the juror, to forego suggesting those reasons to the prospective jurors because the reasons given, that the defendant may be inarticulate or that he may have some "condition" that would prevent him from testifying, were "clearly misleading" to the juror since those reasons did not apply in this case. (R. pp. 267 and 270).
The right of the defendant not to testify on his own behalf is protected by the U.S. Constitution. U.S. Const. amend. V. It is an important aspect of the voir dire examination to discover any prospective juror who may have difficulty understanding this right as well as to discover a juror who may hold it against a defendant who exercises the right. This Court has specifically rejected the contention that unjustified restrictions on voir dire can be cured by a response on the part of the prospective juror that he will follow the law as given him by the judge when the juror is unaware of the complexity of the law and where that law involves such a basic right of the defendant. State v. Brumley, 320 So.2d 129 (La.1975). Rather, counsel must be permitted to informally question the juror of his own experiences and attitudes that may influence his ability to follow the law. "A juror's response to less imposing questions may well reveal attitudes and biases not disclosed by superficially correct answers." State v. Hayes, 364 So.2d 923 (La.1978); State v. Hills, 241 La. 345, 129 So.2d 12 (1961).
On the other hand, counsel cannot be permitted to mislead the jurors as to why a defendant chooses not to testify by suggesting reasons that will not be proven at trial. Upon reviewing the entire voir dire, as must be done in determining whether the defense was impermissibly limited in questioning jurors, Duplessis, supra; State v. Jackson, 450 So.2d 621, 628 (La.1984), we find that defense counsel ably probed this area with subsequent jurors without those "suggestions" and without overstepping the bounds of the wide latitude afforded him. The trial judge did not abuse his discretion in curtailing these questions, Comeaux, supra; State v. Brown, 496 So.2d 261 (La.1986), nor did the limitation cause the defendant any harm in his ability to exercise his challenges.
Defense counsel also objected to the denial of challenges for cause of prospective jurors Rana Rachal and Martha LaCaze, for whom they later exercised peremptory challenges. The defendant must show two elements to prevail on this alleged error: (1) that a challenge for cause by the defendant was erroneously denied by the trial judge; and (2) that all of the defendant's peremptory challenges had been exhausted. State v. Comeaux, 514 So.2d 84 (La.1987); State v. Albert, 414 So.2d 680 (La.1982). In this case, the defendant did exercise all *1317 of his peremptory challenges prior to the selection of the entire jury; therefore, he has the right to complain of any alleged errors committed by the trial judge. Any ruling by the trial judge in erroneously denying a challenge for cause would reduce the number of peremptory challenges available to the defendant. Such error, if shown, denies the defendant a "substantial constitutional and statutory right" and merits reversal. State v. Brown, 496 So.2d 261 (La.1986).
Mr. Rachal is an uncle of the deputy sheriff, Danny Rachal, who arrested Lee for the murder. Danny testified in the suppression hearing held prior to the first trial. However, Danny was not expected to be called as a witness for the resentencing hearing. Mr. Rachal testified that he had not discussed this case with his nephew at all, and even though he was aware of the crime through the media and talk in the town, he had not formed an opinion as to the appropriate sentence. Based on these comments, Judge Whitaker denied the challenge for cause.
It was also revealed that the prosecuting attorney, Mr. Henry, had prepared an act of donation for Mr. Rachal and several family members "four or five years ago." Upon questioning by defense counsel, Mr. Rachal stated that he would return to Mr. Henry if he had another legal problem. He had not had any personal or professional contact with the D.A., however, since that work was performed. Additionally, Mr. Rachal testified that the relationship would not influence his decision in this case.
During further questioning by the defense, Judge Whitaker, in the presence of this juror, told defense counsel to "[a]sk this prospective juror questions that will be helpful in picking a jury." (R. at 485.) The defense objected to these "impartial" comments.
The mere fact that a prospective juror is related to a law enforcement officer is not sufficient to grant a challenge for cause. Such should be granted only if that relationship influences the juror in his ability to make a decision in the case. State v. Jones, 474 So.2d 919 (La.1985), cert. denied 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986), rehearing denied, 478 U.S. 1032, 107 S.Ct. 13, 92 L.Ed.2d 768 (1986); State v. Smith, 430 So.2d 31 (La. 1983).
Furthermore, the fact that the juror had previously hired the D.A. for some unrelated legal business, and that he may do so in the future, is not a sufficient reason to grant a challenge for cause. Only if that relationship would influence the juror in his decision should the challenge be granted. State v. Dupuy, 319 So.2d 294 (La.1975). The trial judge did not abuse his discretion in this instance. Nor did the judge's comment so prejudice this juror against the defendant as to warrant excusing him for cause. State v. Johnson, 438 So.2d 1091 (La.1983).
Next, the defendant contends that the trial judge committed reversible error by failing to grant a challenge for cause against prospective juror Martha LaCaze. Ms. LaCaze testified that she knew the basic facts of the case from newspaper accounts and discussions with friends. She further stated that
"At this point all I know is what's been in the paper. And I feel that a crime of that nature is the most serious crime that there could be. And at this point I would think it probably would warrant the most severe [penalty].... Just based on what I've read, what I know about it."
(R. at 341.)
She further stated that this opinion was only based on her knowledge of what happened, that she did not know all the facts, and that she could change her mind based on the evidence and information provided by the defense. She stated that:
"If I am selected to be on the jury then I would do my very best to listen to every bit of evidence from both sides and make the decision from that point." ... "I *1318 would listen to everything and I would do as the judge instructed, as far as taking everything under consideration."
(R. at 345-47.)
Judge Whitaker denied the defense challenge for cause finding that the juror could weigh the evidence and arrive at a "fair conclusion." However, he also stated within the presence of the juror that
"[y]ou know, we've led her down the primrose path, a juror that's been honest here, and tried to give straight forward answers. And she's already testified... ... I think it's very ingenious questioning on the part of Mr. Guerriero [defense counsel], doing a good job ..."
(R. at 357.)
Counsel's objection complaining of the prejudicial effect of those comments by the trial judge was also overruled.
When a juror expresses a predisposition as to the outcome of a trial, a challenge for cause should be granted. Yet, if after subsequent questioning the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. When assessing whether a challenge for cause should be granted, the trial judge must look at the juror's responses during her entire testimony, not just "correct", isolated answers; State v. Copeland, 530 So.2d 526 (La.1988); Comeaux, supra; State v. Smith, 430 So.2d 31 (La.1983), or, for that matter, "incorrect", isolated answers.
Ms. LaCaze stated that her initial reaction in this case would have been to give the defendant the death penalty, but that this opinion was based solely on what she knew about the case at that timethat Tracy Lee had murdered Rohn, and had raped Chandra and Marjorie Blackston. She also stated that, if chosen as a juror and upon instructions by the trial judge, she could listen to and weigh any mitigating evidence presented by the defense before she came to a decision.
A review of Ms. LaCaze's entire testimony reveals that she only could vote for the death penalty under the appropriate circumstances, but that she would assess all of the evidence before making any decision. Therefore, we find that this juror was successfully rehabilitated, and the challenge for cause was properly denied. See State v. Comeaux, 514 So.2d 84 (La.1987); State v. Ellwest Stereo Theatres, Inc., 412 So.2d 594 (La.1982).
Likewise, the comments made by the trial judge in the presence of Ms. LaCaze were not sufficient to excuse her for cause. The neutrality of the trial judge is of the utmost importance to the conduct of a fair and impartial trial. If the remarks by the trial judge are such as to influence a jury and contribute to the verdict rendered, those comments constitute reversible error. State v. Johnson, 438 So.2d 1091 (La.1983); State v. Gallow, 338 So.2d 920 (La.1976).
While the trial judge's comments were perhaps imprudent, they cannot be said to have prejudiced this juror against the defendant. The criticism of the defense counsel would not likely have turned this juror against the defendant. Furthermore, the remarks were not a comment on the evidence, and cannot be said to have contributed to the penalty imposed. State v. Johnson, 438 So.2d 1091 (La.1983).
Assignment of Error No. 5
Defendant also objected to the trial judge's ruling that certain testimony by the defendant's sister, Charlotte Lee, constituted hearsay. The statements concern conversations between the defendant and Charlotte in the fall of 1984, eight months before the crime was committed. Defense counsel argues that the defendant's statements in those conversations are permissible as an exception to the hearsay rule to show the defendant's state of mind.
La.C.E. art. 803(3) allows the introduction of out-of-court statements by a declarant if used to show the declarant's "then existing state of mind, emotion, ... offered to prove the declarant's then existing condition *1319 or his future action."[6] The Code of Evidence and our jurisprudence allow the out-of-court statements by a declarant to prove circumstantially the declarant's state of mind, if the statements are relevant to an issue in the case, because the statements are only intended to show that the statement was made, not to prove the truth of what was said. The jury is not asked to determine the truth of the statement, but rather to assess the credibility of the witness in determining if the statement was in fact made by the declarant, State v. Eaton, 524 So.2d 1194 (La.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); State v. Martin, 458 So.2d 454, 460 (La.1984), and to assess the state of mind of the declarant, at the time the statement was made, if relevant to an issue before the jury.
The State contends that these statements are not relevant because made eight months prior to the crime. However, evidence to prove the declarant's state of mind can be used to prove his subsequent conduct. La.C.E. art. 803(3). The length of time between the making of the statement and the conduct in question does not determine the admissibility, but rather goes to the weight of the evidence. State v. Martin, 458 So.2d 454 (La.1984).
The testimony by Charlotte was offered as part of the defendant's mitigating evidence, in support of the defense's contention that Tracy's conduct at the time of the crime "was impaired as a result of mental disease." See La.C.Cr.P. art. 905.5(e). Special precaution should be taken in capital cases to allow all relevant mitigating evidence before the jury, Eaton, 524 So.2d at 1205; State v. Weiland, 505 So.2d 702, 707 (La.1987), to give the defendant "a meaningful opportunity to present a complete defense," a right guaranteed by the U.S. Constitution. Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986).
Defense counsel contends that the statements excluded from evidence are critical as a mitigating factor to explain Tracy's actions on the evening of the crime as they evidence Tracy's stress and a psychological disorder diagnosed by the psychiatrist, Dr. Ware. Furthermore, because these statements were made to Charlotte prior to the crime, they are more reliable than statements made to Dr. Ware after the crime occurred, since those latter statements could be construed as self-serving.
We find that Charlotte's statements should not have been excluded by the trial judge. The statements the defense sought to have admitted into evidence were to prove the defendant's state of mind, as corroborated by Dr. Ware. We also find, however, after a review of Charlotte Lee's testimony, that the error was harmless. In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the U.S. Supreme Court held that an error can be considered harmless if the prosecutor proves beyond a reasonable doubt that the error did not contribute to the verdict. That standard has been applied by this Court in ruling that certain errors made in the district court are harmless, and thus do not warrant the reversal of a conviction. See State v. Smith, 554 So.2d 676 (La. 1989); State v. Walters, 523 So.2d 811 (La. 1988); State v. Green, 493 So.2d 1178 (La. 1986).
The D.A. objected to testimony by Charlotte that she attributed to Tracy. However, a review of the hearing transcript indicates that Charlotte had given most of her testimony at the time of the objection and that she continued to make such statements without further objections from the D.A. For instance, Charlotte testified that the defendant felt distant and "removed" following his father's death; and, that for the first time in his military career his conduct had warranted a reprimand. She also testified that Tracy no longer had the same proud attitude towards his career as he had in the past.
*1320 After Tracy was transferred to Fort Polk, Charlotte testified that he maintained less contact with his family, and that Tracy "seemed depressed." He did tell her, in the fall of 1984, that he had tried to kill himself, believing that he had a "social disease." Later, however, he became involved with a young woman in the area around Fort Polk. Charlotte testified that the defendant told her he was "in love" with that woman and planned to marry her. And, when the woman subsequently ended the relationship, he was "devastated" and "very unhappy." The breakup was shortly before the crime was committed.
The defense does not suggest any additional statements that Charlotte would have made. Therefore, we find that the exclusion of Tracy Lee's statements to his sister was harmless error because Charlotte apparently was not precluded from testifying to the substance of the statements made to her. Consequently, it is evident beyond a reasonable doubt that the error by the trial judge in ruling that the statements were inadmissible did not contribute to the penalty.[7]
Assignment of Error No. 6
The defendant next alleges that a mistrial should have been granted based on comments made by the D.A. in closing arguments. The defense contends that these comments referred to the defendant's failure to testify. The comments at issue are as follows:
"Let's look at the premeditation involved in this case. He had to come to the Blackston house with that pistol. He had to have.... well, you heard Dr. Ware, he had a hundred and fifty (150) rounds of ammunition. That's a lot of bullets. He had that mask on his face. He didn't just happen into the house. He wasn't just walking down the street and just stumbled into the house. He had that mask on. He had his.... he wiped the fingerprints off in the kitchen. You heard Chandra. Now is that premeditated or what? I mean, that to me is must [sic] better evidence of his state of mind and his intent than any witnesses can tell you. Cause the witnesses don't know, they weren't there that night. The only people that were there were Chandra.... that can still talk, were Chandra, Marjorie and the defendant."
(R. at 1332)
The Fifth and Fourteenth Amendments of the U.S. Constitution protect the right of the defendant not to testify on his own behalf by forbidding the prosecution to comment on the defendant's silence. Griffin *1321 v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). In addition, state law provides for a mistrial if the district attorney comments before the jury, "directly or indirectly" on "[t]he failure of the defendant to testify in his own defense[.]" La.C.Cr.P. art. 770(3).
In this case, we determine that the comments by the D.A. were not an indirect reference to the defendant's failure to testify. Instead, the comments were directed to the events of the crime which the defense did not contest. When read as a whole, it can be seen that the prosecution was merely focusing the jury's attention on the events of the crime, suggesting these events spoke more eloquently to defendant's character than testimony by defendant's character witnesses who were not present during the commission of the crime. Because the comment did not serve to focus the jury's attention on the defendant's failure to testify, but rather on the conduct of the defendant in perpetrating the crime, the trial judge correctly ruled that a mistrial was not warranted.
The assignment of error is without merit.

DECREE
For the foregoing reasons defendant's sentence to death is affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until:
(a) defendant fails to petition the United States Supreme Court timely for certiorari,
(b) that court denies his petition for certiorari,
(c) having filed for and been denied certiorari defendant fails to petition the United States Supreme Court timely under their prevailing Rules for applying for rehearing of denial of certiorari, or
(d) that court denies his application for rehearing.
DEATH SENTENCE AFFIRMED.
NOTES
[1] Doty confined his poll to only registered voters because this was the sole source of names comprising the general jury venire.
[2] Oral arguments on rehearing in connection with this very defendant's first appeal were held at the Louisiana School for Math, Sciences and the Arts as a means of calling attention to the bicentennial celebration of the United States Constitution.
[3] This Court has upheld the use of voter registration lists as a sole source for selecting general venires. State v. Cass, 356 So.2d 936 (La. 1978); State v. Anderson, 315 So.2d 266 (La. 1975).
[4] Inclusion of the 158 names was contrary to the jury commission's order to destroy all old names, and contrary to the proces verbal executed by the jury commission on August 18, 1988. The removal of old names, however, is not constitutionally nor statutorily required. See La.C.Cr.P. art. 408.
[5] Of the 125 for Division A, 69 were called at trial, randomly selected from the venire. Of those 69, only 9, or 13%, were black. There is no evidence in the record as to the race of the remaining 56 jurors in the venire that were not questioned.
[6] La.C.E. art. 803(3) provides: "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or his future action...."
[7] Charlotte testified that Tracy's father died in August 1983, after which time Charlotte and the family noticed a change in Tracy's personality, that he was more distant and "removed" than before. Following his father's funeral, Tracy stayed with his mother for about six weeks, obtaining additional leave from the army. On this visit, the family noticed that he had a small patch of hair missing, but he was very "sensitive" about that when questioned. Tracy then returned to Korea, where he was stationed at the time. Charlotte's testimony reflects that she had spoken to the defendant on numerous occasions upon his return to Korea and Tracy indicated that he wanted to return home to be much closer to his family. Tracy also told Charlotte that he was reprimanded by the army for overbuying rationed goods upon his return to Korea from the funeral. This is the only trouble that she was aware he had been in while in the military. She stated that he had received many awards during his military career, and was very happy as a soldier. He remained in Korea for nine months following his return, and was then assigned to Fort Polk.

Before arriving at Fort Polk, Tracy stayed at his mother's house on a 30 day leave. The family noticed that even more hair was missing this time. He was again reluctant to discuss any problems.
Charlotte's telephone conversations with Tracy became less frequent after he arrived at Fort Polk because the defendant did not seem to want much family contact. She found that Tracy "seemed depressed." In one conversation that she did have with him, Tracy told her that he had tried to kill himself, believing that he had a "social disease."
Tracy later became involved with a young woman in the area around Fort Polk. Charlotte testified that he was "in love" with her and planned to marry her, and that this was the first serious relationship that Tracy had been involved in. He seemed much happier at that time, and began to write and call his family more. He wrote home about her and her two children and told his family how much he enjoyed caring for them. When the woman later wanted to stop seeing him, he was "devastated" and "very unhappy", and tried to get her to come back to him.