724 So.2d 817 (1998)
STATE of Louisiana, Appellee,
v.
Terry L. FLANAGAN, Appellant.
No. 31,497-KA.
Court of Appeal of Louisiana, Second Circuit.
December 9, 1998.
*819 Henry Paul Garner, Jr., Louisiana Appellate Project By Peggy J. Sullivan, Monroe, for Appellant.
Richard Ieyoub, Attorney General, Walter E. May, Jr., District Attorney, C. Glenn Fallin, Assistant District Attorney, for Appellee.
Before WILLIAMS, STEWART and CARAWAY, JJ.
STEWART, J.
Following trial by jury, Terry Flanagan was found guilty as charged of simple burglary. The trial court sentenced defendant to twelve years at hard labor. Defendant now appeals his conviction and sentence and assigns seven errors. For the following reasons, we affirm.

FACTS
At approximately 2 a.m., on Sunday, June 29, 1997, J.J.'s, a café/bar near Kepler Lake in Bienville Parish, was broken into, and the intruders attempted to steal money from the video poker machines. The defendant and Jennifer Kelley were charged with the crime.
At the defendant's trial, James McGlamery, one of the owners of J.J.'s, testified that he was awakened by a phone call on June 29, 1997, at around 2:15 a.m. The call came from the security system in his business, and it indicated the business was being robbed. Mr. McGlamery only lived about a block from his business, so it only took him a few seconds to drive to the business.
Mr. McGlamery drove up to the business, shining his headlights on the front door. Then, he saw two people run out of the building, and he chased them. He stated one of the people was black and the other was short. He could not tell the gender of either. Both were wearing dark clothes. The intruders ran around the building and crossed the road. Mr. McGlamery fired his gun into the air to get them to stop, but they kept running.
The intruders entered the building by breaking the lock on the front door. Mr. McGlamery said two of the three video poker machines in the building were damaged as *820 the bottom doors of the machines were broken, but he did not think any money was taken. There was minor damage to the front door, and a screwdriver, which did not belong to Mr. McGlamery, was found inside the front door. He stated no cars were around the building other than his, but a small Ford car was found at a public boat ramp a short distance away. He had not seen the car before, and it was parked on a small road beside an abandoned house. He helped the police with the search for the intruders, and he found a tire tool and some socks behind another abandoned house.
Mr. McGlamery stated he knew neither the defendant nor Jennifer Kelley, and he did not give either of them the authority to enter the building. On cross-examination, Mr. McGlamery stated he could not identify the people he saw running out of his business. He could not recall anything about the clothing the intruders were wearing other than the clothes were dark.
Barbara McGlamery testified that she owned J.J.'s along with her husband. She stated that after her husband went to the business, she called the police and their daughter. She stated a person could walk from her home to the business in one minute. Once she arrived at J.J.'s, she did not see anyone other than her husband. She did not see anyone run from the building. She knew neither the defendant nor Jennifer Kelley, and she did not give either authority to enter the building.
Margaret Guin, the McGlamerys' daughter, testified that she lived near her parents. After receiving the call from her mother, she went to the building, and she did not see anyone there other than her parents. There was someone on the lake with a spotlight, and as she thought the person might be sending a signal, she went to the public boat ramp to see if anyone was there. She found a car backed off the road beside a vacant house. She did not see anyone in the car, and she left to tell her father what she found. On cross-examination, she stated she did not get out of her vehicle to look at the car as she just shined her headlights on it.
Jess Ketchum, a deputy with the Bienville Parish Sheriff's Department, testified he was on duty the night of the burglary, and he went to the scene. When he arrived, Mrs. McGlamery was there, and she identified herself as the owner of the business. He pulled up to the front door of the building and shined his headlights inside, but he did not go in until back up arrived. He stated the front door was open, and he could hear the alarms on the video poker machines going off. When Deputy Huckaby arrived, they went inside, but they did not find anyone there. Deputy Ketchum found a big screwdriver on the floor, and Mr. McGlamery stated it did not belong to him.
Alonzo Alford, a deputy with the Bienville Parish Sheriff's Department, testified he was on patrol when he received a call about the burglary. On his way to J.J.'s, he met Mr. McGlamery and Ms. Guin, and they showed him the car by the vacant house. He called the car's license number in to the sheriff's department, and a tow truck eventually came to move the car.
Brandon Huckaby, a deputy with the Bienville Parish Sheriff's Department, testified he was at home when he received a call about the burglary. On his way to J.J.'s, he passed Deputy Alford to checked with him. Once at the scene, he secured the building along with Deputy Ketchum. No one was inside the building. Deputy Huckaby returned to where the car was located, and when he looked inside it, he saw what appeared to be a wallet under the seat.
Ricky Bridges, a deputy with the Bienville Parish Sheriff's Department, testified that on June 30, 1997, he went with other officers to arrest the defendant in Arcadia. Deputy Raley told Deputy Bridges there was an arrest warrant for the defendant, and Deputy Raley had been told the defendant was on Bishop Street. Deputy Bridges stated the defendant was found asleep on the front porch of a trailer home. The defendant was wearing dark jeans and a black t-shirt. As Deputy Raley arrested the defendant, Deputy Bridges searched the defendant and found some car keys in his front pocket. The key chain had American Auto Rental of Monroe on it. Deputy Bridges said the defendant appeared to be tired and dirty when arrested, *821 and the defendant had several cuts on his arms. On cross-examination, the deputy said the defendant was wearing a short sleeve t-shirt and tennis shoes.
Ronald Tipton, Jr. testified that he operated a wrecker and would sometimes store or seize vehicles for the Bienville Parish Sheriff's Department. On June 29, 1997, at around 3 a.m., he was called to pick up the abandoned car. He stored the vehicle at his place of business. The car, a Ford Taurus, was kept inside a building. Mr. Tipton left the car at 6 a.m., and he returned to his business the next morning. He checked the car, and it had not been bothered. Deputy Price later came to inventory the car.
Jennifer Kelley testified that she and the defendant broke into J.J.'s. She stated that she was with the defendant on June 28, 1997. They were at Sonya Lively's trailer in West Monroe, and at about 9 p.m., Kelley was talking with Lively about a problem Kelley was having with a bail bondsman. Kelley put up some of her property as collateral in order to bond Lively's brother, Terry Lefler, out of jail, and the bondsman wanted Kelley to sleep with him in order for her to get her property back.
Kelley stated the defendant said he could help her get some money. He said he knew of an easy place to rob. He did not say anything about the place other than it was secluded and had no alarms. Kelley's job on the robbery was to watch for police or lights.
Kelley went to Ruston with the defendant, and they checked into a motel. She said the defendant put all of his belongings in the room, and he left. He returned about twenty or thirty minutes later, and they loaded the car up and left. The defendant was driving when they left the motel, and they went to the Wal-Mart Supercenter in Ruston. The defendant said he was going into the store to get a screwdriver, and he came out with a Wal-Mart bag. Kelley did not see the screwdriver at this point, but she saw it later.
When they left Wal-Mart, the defendant was driving, and they drove down some back roads. They ended up at J.J.'s, and Kelley stated she had never been there before. She stated they drove past the business and parked in a grassy area. After parking, the defendant changed his clothes, putting on a black t-shirt and black jeans. Then, they drove by the building to observe it and parked again. After parking, they rolled down the front windows to climb out of the car, and they grabbed the screwdriver, a tiretool, a pillowcase, and a pair of wirecutters to take with them. Kelley was wearing gloves, and the defendant had socks on his hands.
They went to the back of J.J.'s, and the defendant cut some lines running to the building. They went to the front door, and the defendant used the tiretool to pry the front door open. After opening the door, the defendant told Kelley to watch for lights. When she saw lights, she yelled at the defendant, and they tried to escape out the back door but could not. Then, they ran out the front door of the building heading for the road, and a man chased them.
After she heard gunshots, Kelley ran to a house, and she became entangled in a bush where she lost a glove. She waited for the scene to quiet down, and she ran to another house and hid under it. She stayed there until daylight. She did not see the defendant after they split up while running.
Once Kelley started running again, she wandered through the woods until she was caught. She scratched up her forearms while running through the woods. After being caught, she talked with Deputy Price, and she stated the defendant was with her.
A few days later, Kelley initiated contact with Deputy Price in order to give a statement. The statement was recorded. She told Deputy Price that the defendant called her the night of the incident, and she met the defendant in Ruston. At trial, she said that statement was false as the defendant had been staying with Lively and her for a week. She lied to Deputy Price because Lively was pregnant at the time, and Lively did not need the police asking her questions since she did not have anything to do with the crime.
Kelley stated that neither the sheriff nor the district attorney had made any promises or threats, and she knew that she could be imprisoned because of her testimony. She *822 said she was testifying in order for the situation to come to a conclusion. Then, she identified the defendant as the person she was with when J.J.'s was broken into.
On cross-examination, Kelley said she gave her statement to Deputy Price on July 10, 1997. She said breaking into J.J.'s was the defendant's idea. She said the defendant told her J.J.'s was a good place to rob because it had been robbed several months before their attempt. In her statement to Deputy Price, Kelley stated her uncles, James and Billy Cobb, told her J.J.'s was an easy place to rob. She said she gave that statement because she was trying to protect the defendant.
On cross-examination, Kelley stated she had never participated in a burglary of J.J.'s or similar places with her uncles. She told Deputy Price that she and the defendant had broken into another place several months before the break in at J.J.'s. She stated she was not in a place called the Cheyenne in June, 1997, and she did not know where Campti is. She stated she did not know Shunda Keyes.
Kelley stated she rented the car because the brakes were out in her car. She had rented a car from that agency before, and she did not get a second set of keys from the rental agency. On redirect examination, she stated the defendant parked the car at J.J.'s, and he kept the only set of keys to the car when he got out.
Randy Price, a deputy with the criminal investigations unit of the Bienville Parish Sheriff's Department, received the call about the burglary about 3 a.m. on June 29, 1997. He retrieved the wallet that was inside the car, and the identification in the wallet belonged to Jennifer Kelley. A rental agreement in the name of Jennifer Kelley was found in the glove compartment, and the address on the rental document was the same as on the identification. The identification number on the key ring that was found on the defendant matched the identification number on the rental agreement.
Deputy Price stated two video poker machines were damaged as the doors on the machines were forced open. The area around the machines was fingerprinted, but no prints were recovered. During the search on the morning of the incident, Mr. McGlamery found a tiretool and two socks near the scene. When the car was searched, there was no tiretool in the trunk.
Around 11 a.m. on June 29, 1997, Jennifer Kelley was found. She had on dark clothing and had scratches on her hands and arms. She did not have any keys on her. She was Mirandized, and she told Price the defendant was with her during the burglary. The defendant was not found in the area, and an arrest warrant was obtained for the defendant, as well as a search warrant for the car.
Several items, including a pair of blue jeans, were found in the trunk of the car. A Wal-Mart receipt, dated June 29, 1997 at 12:20 a.m., was found in a pocket of the jeans. The item purchased was a screwdriver. Cash totaling $4.79 was found in the pocket, and the receipt said the total cost of the screwdriver was $3.21, with $1.79 being given in change from a $5 bill. The store number on the receipt was for the Wal-Mart Supercenter in Ruston.
Deputy Price went to the store with the screwdriver on July 1, 1997. The cash register used for the purchase did not have a camera above it, so there was no videotape of the sale. The screwdriver was a Stanley, and Price found another screwdriver that appeared to match it at the store. Price took the screwdrivers to the service desk, and he had the second screwdriver scanned and a receipt printed. The skew number on the second screwdriver matched the skew number on the screwdriver purchased on June 29, 1997, and both cost the same amount.
Deputy Price stated some items in the car were fingerprinted, but no fingerprints were raised. Several items with the defendant's name on them were found in the car, including a letter, paycheck stubs, cellular phone bills, traffic tickets, loan statements from a bank, and a receipt from a bail bondsman. Once the search of the car was completed, Price was informed that the defendant had been arrested. Price used a key found in the defendant's pocket to start the car.
*823 On July 1, 1997, Deputy Price talked to the defendant. During this discussion, the defendant said he had alibis, he was in another state, and he was at a girlfriend's house inside the state. The defendant referred to the case as "flimsy" and said the police were trying to "railroad" him.
A receipt from the Lincoln Motel from June 20, 1997 for Room 101 was found in the car. Price went to the motel to see if the defendant stayed there, and he found a registration card with the defendant's name on it for Room 174 on June 28, 1997. A key found in the ashtray of the car was used to open the door to Room 174 at the Lincoln Motel.
On cross-examination, Deputy Price stated he did not remember anything in the car with the name of Jennifer Cobb on it. Defense counsel pointed out that during the preliminary exam, Price stated the name Jennifer Cobb was on some identification, and this person was the same as Jennifer Kelley. Price stated the name Cobb was familiar because Kelley had some uncles named Cobb, and she told him about the uncles during the interview. Price also knew the name of Kelley's uncles from their previous arrests for burglary, and they were suspected as being part of a group specializing in breaking into video poker machines. Kelley indicated that she had some knowledge of her uncles being involved in robbing video poker machines. Price stated that he attempted to find out where Kelley's uncles were on June 29, 1997, but he did not indicate whether he obtained any information.
Price stated the birth certificate of Shunda Keyes was found in the rental car, and Price knew Keyes' name because Keyes was the victim in a shooting the previous year. Price stated he never considered Keyes as a suspect because he never had a reason to. Price did not investigate the possibility of others being involved in the robbery at J.J.'s as he focused on the defendant since Kelley stated the defendant was with her.
Price stated there was some clothing in the car that he did not seize, and he did not know the sizes of the clothes. Price did not think the clothes were relevant since they did not identify the defendant. No fingerprints were found that identified the defendant.
On redirect examination, Price stated that when she was captured, Kelley told him the defendant was with her during the robbery. Mr. McGlamery stated he saw a black male and another person run out of the building, and since the Cobbs are white, this indicated they were not involved in this incident. Also, Kelley's statement indicated the Cobbs were not involved. Price said he did not seize some of the clothes that were in the car because they did not identify anyone.
Lucky Raley, a deputy with the Bienville Parish Sheriff's Department, testified he arrested Kelley. On June 30, 1997, he received an anonymous call which said the defendant was at a residence on Bishop Street in Arcadia. Raley and the other officers found the defendant asleep on the porch of a residence on Bishop Street. When they woke the defendant up, he said his name was Terry Flanagan, and he was arrested. The defendant was searched, and a key was found in his pocket. Raley was with Price when that key was used to start the rental car.
Raley stated the defendant was wearing black jeans and a black t-shirt when he was found, and his arms were scratched up. Raley stated the Kepler Lake area was a wooded area with many briars. He stated Kelley's arms were scratched also. Pictures of the scratches on the defendant's arms were shown to the jury. On cross-examination, Raley stated he could not say whether the scratches on the defendant were fresh.
The prosecution then rested, and the defense presented its evidence. Dave Thomas, a bail bondsman, testified that he provided bail for Terry Lefler. Thomas said Kelley provided some of the collateral for the bond, and the money for providing the bond was still due. He stated Kelley had not requested a return of the collateral, and he only remembered meeting her one time when she gave him $50 toward the bond. He stated that he never implied or suggested to Kelley that the collateral would be released in return for sexual favors. He stated the bond on Lefler was still active, but he believed Lefler was currently in jail in Longview, Texas. On cross-examination, Thomas stated *824 he did not ask Kelley or Lively to accompany him to a resort in Texas.
Richard Hines testified that he saw the defendant on a Saturday evening at the end of June, 1997. The defendant was at Hines' house. The defendant stayed there for a while, and as he left, he said he was going to Texas but was going to stop at a club in Calvin on the way. Hines went to this club, and he arrived around 1:45 a.m. This place was called the Cheyenne Club. Hines said he saw the defendant come out of the club with some girl Hines did not know. The defendant told Hines that he was going to party with some white girls that night, but Hines saw the defendant leave the club with a black girl.
On cross-examination, Hines stated his girlfriend was Elizabeth Flanagan, the defendant's sister. The prosecutor pointed out that Hines spoke with Price in February, 1998, and at that time, Hines stated he did not remember whether he saw the defendant or not on June 28, 1997 or June 29, 1997. Hines told Price that he did not go anywhere with the defendant around 2 a.m. on June 29 and that he was at home around 2 a.m. Hines stated he did not remember telling Price that he was at home around 2 a.m. on that night. Hines told Price he had never been to the Cheyenne Club, but Hines stated this was because he did not know the name of the place at the time.
Addaren Cottonham, the defendant's nephew, testified that he went to a club on June 28, 1997, and he saw the defendant there. Cottonham did not remember the exact location of the club, but he said it was named Cheny or Shanty. The defendant told him about the place, and Cottonham arrived at the club that night around midnight. Cottonham stayed at the club until around 1:30 a.m., and he saw the defendant there, first with a white girl and then with a black girl. Cottonham stated he also saw Shunda Keyes, whom he knew from Jonesboro, at the club. As Cottonham was leaving the club, he spoke with the defendant, and the defendant said he was going to Shreveport. The defendant said he rode to the club with a white girl, but since they had an argument, he found another ride. Cottonham did not see the defendant leave the club, and he did not see the white girl leave the club. Cottonham admitted to having convictions for aggravated assault and battery of an officer.
Jennifer Kelley was called to testify by defense counsel, and she stated she had not been to J.J.'s prior to the incident. She stated that she told Price that her uncles broke into a place and described it as an easy job, but she had not taken part in a prior robbery of J.J.'s. She stated she was under the impression that she was not going to be sentenced under the habitual offender law for this crime. Her prior conviction was for introduction of marijuana into an institution.
The defendant testified he had prior convictions for attempted armed robbery in 1978, distribution of CDS in 1989, criminal damage to property in 1994, and possession of marijuana with intent to distribute in 1995. He stated that he held various jobs over the last few years, including working at mills, landscaping, and scaffolding. He stated the scaffolding job required him to move from town to town, so he always had to keep some of his belongings with him.
The defendant said he was with Kelley on June 28, 1997, and they were supposed to go to the Cheyenne Club. He told Hines about this. The defendant left Hines and went to Kelley's and Lively's house, and the defendant and Kelley left from there in the rental car. They went to the Lincoln Motel in Ruston. While at the motel, Kelley was smoking cocaine mixed with marijuana. They left the motel to go over to the east end of Ruston because Kelley wanted to go, and he dropped her off somewhere and made the block. When he arrived back where she was at, she was talking to Shunda Keyes.
The defendant and Kelley went back to the motel, and she started smoking marijuana laced with crack. They left the motel sometime after 11 p.m. and went to the Cheyenne Club in Campti. The defendant was not sure of what time they arrived, but he said it took about an hour to get there from the motel. He said he was at the Cheyenne until after 2 a.m. Kelley went in the club with him, but she did not leave with him. He left with Vicki Jefferson.
*825 Kelley became upset because the defendant was talking with Jefferson, and Kelley went outside. Later in the evening, the defendant had Jefferson go outside to see if Kelley was still there, and Jefferson told him that Kelley was with another black man. Then, the defendant went outside, but Kelley was driving off with a man with curly hair. The defendant stated that Kelley had been dating Keyes and that Keyes was in the club in an effort to imply that the man in the car was Keyes. The defendant stated Kelley did not return to the club.
The defendant left the club with Jefferson, and they went to Shreveport. They stayed at a Days Inn until Monday morning. Jefferson brought him back to Arcadia on Monday, June 30, 1997. She dropped him off at a friend's house on Bishop Street, and this is where he was arrested. The defendant stated he was not at J.J.'s with Kelley, and he had nothing to do with the burglary.
On cross-examination, the defendant stated the scratches on his forearms were old, and they may have come from trimming his mother's rose bushes or from scaffolding. On redirect examination, he stated he tried to get Jefferson to testify, but she would not because she did not want the publicity since she was married on the date in question.
The prosecution called Deputy Price as a rebuttal witness. Price stated the windows of the car were down when it was found. He stated there was no key in the ignition switch, but the ignition switch had been left in the accessory position so that the windows could be rolled down.
By bill of information, the state charged the defendant with simple burglary, a violation of La. R.S. 14:62. A jury found defendant guilty as charged of simple burglary. The trial court sentenced defendant to 12 years at hard labor.
On appeal, the defendant alleges that (1) the evidence is insufficient to support the verdict; (2) the trial court erroneously denied two challenges for cause; (3) the trial court failed to grant a new trial because of improper contact between some of the prosecution's witnesses and some of the jurors; (4) the trial court imposed an excessive sentence; and (5) the prosecution was allowed to exercise more than its entitled number of peremptory challenges.

DISCUSSION

Sufficiency of the evidence
Based on the above evidence, the jury found the defendant guilty of simple burglary. The defendant now asserts that the evidence presented at trial was not sufficient to support this finding and that the trial court erred in denying the motion for post-verdice judgment of acquittal.
The relevant inquiry when reviewing a conviction for the sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard, initially enumerated in Jackson, and now legislatively embodied in La.C.Cr.P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Cotton, 25,940 (La.App.2d Cir.3/30/94), 634 So.2d 937. For circumstantial evidence to sustain a conviction, upon assuming every fact to be proved that the evidence tends to prove, the evidence must exclude every reasonable hypothesis of innocence. Id. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Id.
Under Jackson v. Virginia, supra, the state bears the burden of negating any reasonable probability of misidentification in cases where the defendant asserts he was not the perpetrator or he remains silent. State v. Powell, 27,959 (La.App.2d Cir.6/26/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Ford, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847. The appellate *826 court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Cotton, supra.
Based on the testimony presented at trial, the evidence was sufficient to prove beyond a reasonable doubt that the defendant was guilty of simple burglary. Jennifer Kelley admitted to committing the crime, and she stated the defendant was with her. While her testimony at trial differed somewhat from her prior statement to Price, the jurors still could have reasonably found that she was telling the truth when she stated the defendant was with her at J.J.'s. On top of her testimony, the police found many items belonging to the defendant in Kelley's rental car which was near the scene of the crime, and the keys to that car were found on the defendant. The defendant's arms were scratched up when he was found, as were Kelley's. One of the defendant's alibi witnesses, Richard Hines, could not really be seen as reliable as his testimony at trial concerning whether he had seen the defendant on the night in question contradicted his prior statement to Deputy Price. While the defendant stated he did not commit the crime, the jurors could have rationally chosen to believe Kelley's testimony instead of his based upon all of the evidence presented. The jurors had a credibility decision to make, and they chose not to believe the defendant. The evidence supports this decision. These assignments lack merit.

Challenges for cause
In this assignment, the defendant alleges the trial court erred in not granting his challenges for cause of both Caprice Cherry and Brenda Jefferson. When questioned during voir dire, Ms. Cherry stated that her home was burglarized within the last year by her niece's boyfriend and that her brother had a conviction for burglary. She stated neither the robbery of her home nor her brother's conviction would affect her decision as a juror. The judge denied the challenge for cause as he found her to be neutral based on being a victim of crime herself and on her brother's conviction.
Ms. Jefferson knew the prosecutor, Glenn Fallin, because a partner in Fallin's firm, Russell Davis, was doing some work for her. She stated that she was the tutor of a young boy, and Davis was handling the legal work. She stated she just came to the office to sign papers when Davis told her to. She had a great deal of trust in Davis, and Fallin was not involved in the tutorship. She stated knowing the prosecutor would not affect her decision as a juror as she could be fair to both the state and the defendant. Fallin stated he had never done any work for Ms. Jefferson. The trial judge denied the challenge without giving any reasons.
When a defendant uses a peremptory challenge after a challenge for cause has been denied, the defendant, in order to obtain a reversal of the conviction, must show the erroneous denial of the challenge for cause and the use of all peremptory challenges prior to completion of the jury panel. La.C.Cr.P. art. 800; State v. Ross, 623 So.2d 643 (La.1993). Defense counsel did challenge Ms. Cherry and Ms. Jefferson for cause, and the challenges were denied. Ms. Cherry was excused with a peremptory challenge. Ms. Jefferson served on the jury. The record does indicate that the defendant used all six of his peremptory challenges during voir dire, so the defendant does have the right to have this court review the denial of the challenges for cause.
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts for which bias, prejudice, or inability to render judgment according to law may be reasonably implied. State v. Bourque, 622 So.2d 198 (La.1993). The trial judge is afforded great discretion in determining whether cause has been shown to reject a perspective juror, and such determinations will not be disturbed on review unless a review of the voir dire as a whole indicates an abuse of discretion. Id.
The trial judge did not err in denying the challenge for cause of Ms. Cherry based upon her being the victim of a burglary. It is not error to refuse to excuse for cause a prospective juror who has been the victim of a robbery when questioning showed *827 that the juror could be impartial. State v. Henderson, 571 So.2d 770 (La.App. 2d Cir. 1990). Ms. Cherry stated the burglary of her home would not affect her decision in this case, and nothing in her other voir dire responses indicated that she would not be impartial. There is no indication that the trial judge abused his discretion in denying the challenge for cause.
Even though Ms. Jefferson was a client of a partner in the prosecutor's law firm, the trial judge did not err in denying the challenge for cause. In State v. Lee, 559 So.2d 1310 (La.1990), the court found the fact that a prospective juror had previously hired the district attorney for some unrelated legal business and that he might do so in the future was not a sufficient reason to grant a challenge for cause. The court stated only if the relationship would influence the juror in his decision should the challenge be granted. Id. While Ms. Jefferson did indicate that she placed a great deal of trust in Davis, she did not have an attorney/client relationship with the prosecutor. Her relationship with Davis should not have influenced her decisions as a juror since he was not the prosecutor in this case. She indicated that she could be a fair juror, and the trial judge apparently agreed. There is no showing of an abuse of discretion. This assignment lacks merit.

New trial
In this assignment, the defendant argues the trial court erred in denying his motion for a new trial based upon alleged contact between some of the prosecution's witnesses and some jurors. At the hearing on the motion for a new trial, Adrienne Sanders testified that she saw some of the jurors talking with the McGlamerys in the hallway of the courthouse on three occasions during the defendant's trial. Sanders stated she was at the defendant's table during the trial, and while the court was in recess, she would walk around the courthouse. She saw the McGlamerys and Guin sitting in the same location in the hallway throughout the trial, and this location was across from the door of the jury room. She saw the jurors in the hallway at times while the McGlamerys were there. While she did not hear the content of any specific conversations, it appeared as though some of the jurors were talking with the McGlamerys. She could not remember any of the jurors specifically other than one was a black male. Sanders was the secretary and girlfriend of the defendant's trial counsel.
Harlan Smith, the bailiff, stated that he remained with the jury throughout most of the trial, and he never saw the McGlamerys speaking with any of the jurors. Joe Storey, the Sheriff of Bienville Parish, stated he was with the jury when Smith took a break, and he never saw the McGlamerys talking with the jurors. The McGlamerys and Guin all testified that they did not speak with any jurors during the trial. Gerald Krouse, the foreperson of the jury, stated he did not have any contact with the McGlamerys during the trial, and he did not believe any of the other jurors did either. Based on this evidence, the trial judge denied the motion.
The decision on a motion for a new trial rests within the sound discretion of the trial judge, and the ruling will not be disturbed on appeal absent a clear showing of abuse. State v. McLemore, 26,106 (La. App.2d Cir.6/24/94), 640 So.2d 847, writ denied, 94-1908 (La.12/9/94), 647 So.2d 1107. As a general rule, a motion for a new trial will be denied unless injustice has been done. Id.
In any jury trial, there is a presumption of impartiality. Id. However, any unauthorized communication, contact, or tampering directly or indirectly, made by a nonjuror with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, if not made in accordance with the rules of court and the instructions and directions of the court made during the trial, with full knowledge of all the parties. Id. The presumption is not conclusive, but the burden rests heavily upon the state to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. Id. Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury's deliberations. Id. Thus, an adequate demonstration of extrinsic influence upon the jury *828 overcomes the presumption of jury impartiality and shifts the burden to the state to show that the influence demonstrated was not prejudicial. Id.
The trial judge did not abuse his discretion in denying the motion as there was not adequate evidence of any contact between the jurors and the McGlamerys. While Sanders stated she saw conversations between the McGlamerys and some jurors, the McGlamerys denied the contact, and no one else that would have seen such conversations had seen one. As Sanders testimony was contradicted by some witnesses and could not be substantiated by others, her testimony was not sufficient to show any unauthorized contact between the McGlamerys and the jurors. Even if her testimony showed that conversations did take place, since she did not know the content of the conversations, there is no proof that any conversations were prejudicial to the defendant. This assignment lacks merit.

Excessive sentence
In these assignments of error, defendant asserts that the trial judge imposed an excessive sentence and that his trial counsel was ineffective during the sentencing phase of this proceeding because trial counsel failed to file a motion for reconsideration of the sentence. The trial judge sentenced the defendant to 12 years at hard labor, the statutory maximum under La. R.S. 14:62. No oral or written motion for reconsideration of sentence was filed.
As the defendant did not file a motion to reconsider sentence under La. C.Cr.P. art. 881.1 in the trial court, review is limited to a bare claim that the sentence is constitutionally excessive. State v. Park, 30,394 (La.App.2d Cir.2/25/98), 707 So.2d 1058. Constitutional review turns on whether or not the sentence is illegal, grossly disproportionate to the severity of the offense, or is shocking to a sense of justice. Id.
The sentence imposed by the trial court was within the statutory range, and the sentence does not seem to be grossly disproportionate or shocking considering the defendant's extensive criminal record. However, as the defendant is alleging that his trial counsel was ineffective because of the failure to file a motion for reconsideration of sentence, the merits of the excessive sentence claim must be examined further.
In State v. Lee, 26,542 (La.App.2d Cir.5/12/94), 636 So.2d 634, this court expressed the following standard for ineffective assistance claims:
In alleging ineffective assistance of counsel, a defendant must satisfy a two-pronged test by showing, first, his attorney's performance to be so deficient as to deny him the "counsel" guaranteed by the Sixth Amendment; and, second, that those errors are so serious as to deprive the accused of a fair trial, i.e., one with a reliable result. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail under the Strickland test, the defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Knighton v. Maggio, 740 F.2d 1344 (5th Cir.1984).
While failing to ask for reconsideration of the sentence could arguably be considered an unprofessional error, the defendant has not shown that filing a motion to reconsider would have resulted in a different sentence. As noted by the trial judge when imposing sentence, the defendant was 39 years old at the time he was sentenced, and he had been in and out of prison since the age of 17. The trial judge noted the defendant's numerous felony and misdemeanor convictions, including convictions for attempted armed robbery, misdemeanor thefts, and a prior simple burglary. Considering the defendant's extensive criminal record, it is unlikely that filing a motion to reconsider would have changed the sentence handed down. These assignments lack merit.

Errors patent
The defendant alleges as an error patent that the trial court erred in allowing the prosecution to exercise too many peremptory challenges. The record does reflect that the prosecution exercised 7 peremptory challenges instead of the 6 allowed by La. C.Cr.P. art. 799. However, a notation on the *829 seventh peremptory challenge slip seems to indicate that this peremptory challenge was used when selecting an alternate juror. If the challenge was used in selecting the alternate juror, then this peremptory challenge was allowable under La.C.Cr.P. art. 789. The voir dire transcript does not indicate which jurors were peremptorily challenged or when they were challenged, and the transcript does not indicate which jurors were considered for the alternate slot. The only documentation of the use of peremptory challenges in the record is in the peremptory challenge slips.
If the prosecution's seventh peremptory challenge was not used in selecting the alternate juror, this can only be recognized on appeal as an error patent as no contemporaneous objection was made. La.C.Cr.P. art. 841. The scope of this court's review extends only to errors assigned by the defendant and to such error which is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence. La.C.Cr.P. art. 920; State v. Wade, 29,234 (La.App.2d Cir.4/2/97), 693 So.2d 195. For the purposes of error patent review, the "record" in a criminal case includes the caption, the time and place of the holding of court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filled in connection with a shortform indictment or bill of information, the mentioning of the impaneling of the jury, the verdict, and the judgment or sentence. Id.
In State v. Luquette, 275 So.2d 396 (La. 1973), the court stated matters involving the impaneling of the jury are properly considered as part of the "proceedings" as contemplated by La.C.Cr.P. art. 920(2) which the court must notice on its own motion. In that case, the court found error in the failure of the trial judge to sequester jurors in a capital case after some were sworn, but before the entire jury was chosen. Id. The error was found by looking at a minute entry, and the minute entry was discoverable by a mere inspection of the proceedings and without the inspection of evidence. Id.
If the prosecution was allowed too many peremptory challenges, this arguably could be considered as an error patent as it could be discovered merely by looking at the peremptory challenge slips. But as the slips seem to indicate that the seventh peremptory challenge was used in selecting an alternate juror and the transcript of voir dire does not indicate how the peremptory challenges were used, it seems as though further evidence would be needed to decide whether an error actually occurred. If this was an error patent, then reversal of the conviction is required because a ruling which grants the prosecution more peremptory challenges than allowed by law constitutes reversible error. State v. Shelton, 377 So.2d 96 (La. 1979). However, as noted above, there does not appear to be an error here as the prosecution's seventh peremptory challenge appears to have been exercised when selecting the alternate juror.

Post-conviction Relief
The trial judge informed the defendant that he had three years from the date his sentence became final to file an application for post-conviction relief. The prescriptive period for post-conviction relief runs from the date the judgment of conviction and sentence becomes final. La.C.Cr.P. art. 930.8(A).
Because the trial court did not inform the defendant that the prescriptive period begins to run from the date the conviction and sentence become final, the trial court inadequately complied with La.C.Cr.P. art. 930.8. State v. Lofton, 26,732 (La.App.2d Cir.1/25/95), 649 So.2d 148.

CONCLUSION
For the foregoing reasons, we affirm defendant's conviction for simple burglary and sentence of twelve years at hard labor. We direct the trial court to give the defendant written notice that the prescriptive period for applying for post-conviction relief begins when the judgment of conviction and sentence becomes final and to file proof of the defendant's receipt of such notice in the record *830 of the proceeding. See State v. Ross, 26,272 (La.App.2d Cir.8/17/94), 641 So.2d 732.
AFFIRMED.